W. H. BENDER, Appellee, v. CITY OF IOWA CITY et al., Appellants.

No. 43212.

NOVEMBER 17, 1936.

REHEARING DENIED FEBRUARY 19, 1937.

Messer & Nolan and Samuel D. Whiting, for appellants.

Will J. Hayek, for appellee.

HAMILTON, J.—Thomas E. Martin was elected mayor of Iowa City, Iowa, at the spring election, 1935. His predecessor was Harry D. Breene. The chief of police under Mayor Breene was the plaintiff, W. H. Bender, who held his office until the expiration of his term on or about the 3d day of April, 1935, when Mayor Martin appointed the new chief of police, the defendant, C. O. Paine, a nonservice man. Plaintiff made oral and written application along with several other applicants, including the incumbent, C. O. Paine, for this appointment. According to the testimony of Mayor Martin and the members of the city council, the mayor made a personal and, what he claims a thorough, investigation of the merits and qualifications of all the applicants, and, at several informal meetings of the council and the mayor, the relative merits and demerits of the various applicants were freely discussed, and after these discussions and investigations, at a formal meeting on the 1st day of April, 1935,

C. O. Paine was appointed by Mayor Martin, who stated that he considered Paine was the best qualified for this position, and while not required by law, the city council, following a custom in Iowa City, unanimously approved the appointment. The plaintiff promptly on April 9, 1935, filed his petition in equity, asking for a writ of mandamus, making the city of Iowa City, Thomas E. Martin, the mayor, the various members of the city council, and C. O. Paine, the newly appointed chief of police, defendants. The matter was set down for hearing by order of court for the 22d day of April, 1935, upon ten days written notice. The petition was attacked by motion to dismiss, motion for more specific statement and motion to strike, all of which were overruled. The answer raises among other things the following issues: (1) That the office of chief of police does not come within the provisions of the soldiers' preference law; (2) that such office is included among the exceptions; (3) that said appointment was made after due deliberation and consideration of the merits and qualifications of said applicants and in the best interests of the citizens, residents and general public of Iowa City; (4) that an action of mandamus will not lie. The trial court apparently assumed that under this form of action of mandamus, the procedure involved a hearing upon the merits and a determination by the court as to the qualifications of the plaintiff, and the incumbent, as well as the question of whether the appointing power, namely, the mayor, abused his discretion in failing to appoint the plaintiff.

Before taking up the specific issues and legal questions involved, we deem it advisable to set forth some established legal principles by which our course should be guided.

The Soldiers' Preference Act, House File No. 227, Chapter 9, Laws of the 30th General Assembly, is entitled, "An act regulating appointments, employment, and removals in the *public departments* and upon public works in the State of Iowa, and the counties, cities and towns thereof," and is now found in chapter 60 of the 1935 Code (section 1159 et seq.). Section 1159 provides:

"In every public *department* and upon all public works in the state and of the counties, cities, towns * * * honorably discharged soldiers * * * who are citizens and residents of this state shall * * * be entitled to preference in appointment, employment

and promotion over other applicants of no greater qualifications."

Section 1161 provides: "* * * the officer, board or person whose duty it is or may be to appoint or employ some person to fill such *position or place shall,* before appointing or employing anyone to fill such position or place, *make an investigation as to the qualifications* of said applicant for such *place or position.*"

Section 1162 provides: "Mandamus. A refusal to allow said preference * * * shall entitle the applicant * * * to maintain an action of mandamus to right the wrong." (Italics ours.)

Evidently, plaintiff is proceeding under this last section of the Code to right the alleged wrong.

The wrong to be righted for which mandamus will lie is *the refusal to allow the preference* accorded the ex-soldier over other appointees of no greater qualifications. Manifestly, it was not the design and purpose of the legislature in enacting the soldiers' preference law to deprive municipalities of the very best service obtainable in selecting their public servants and employees. To this end, equality of qualifications is a condition to awarding the preference, and the purpose of requiring the ex-soldier to have equal qualifications before entitling him to preference is so as not to deprive the public of the benefit of superior service and the advantage of securing best qualified men for the public service.

Who is to determine this matter of qualification and whether that of the ex-soldier is equal? This question was asked and definitely answered by this court in Boyer v. Mayor, etc., of City of Creston, 113 N. W. 474. That case involved the appointment of a street commissioner and is on all fours with the instant case. There were five other applicants, none of whom were ex-soldiers. There was a hearing before the city council, and following the hearing one McFee was appointed. Thereupon, Boyer, the ex-soldier, commenced an action of mandamus under this same identical section of the Code. The answer admitted the appointment of McFee and alleged that the same was made after hearing the evidence produced before the council, and after deliberation and a finding by the council that the qualifications of McFee were superior to those possessed by plaintiff. On the issues thus joined the case went to trial, evidence being produced as to the respective qualifications of plaintiff and McFee, and resulting in the dismissal of the petition. This court said:

"The preference act says that an ex-soldier having equal qualifications shall have preference in appointments, etc. Who is to determine this matter of qualification, and whether that of the ex-soldier is equal? *Without doubt, the appointing power;* the official—person or body—*responsible,* directly or indirectly, *to the people for the proper performance of the duties which are the subject of the appointment.* And, of necessity, that official— person or body—must exercise its own discretion and judgment in determining the matter in hand and making choice among the applicants. As in all other cases, and on familiar principle, where discretion is lodged in an official, the courts are not authorized to interfere with the exercise thereof, *except in cases of clear abuse.* This is no more than to say that such official *may not act arbitrarily and unwarrantably,* or in *disregard of evidence clearly and unmistakably* pointing to a contrary result." (Italics ours.)

The test to be applied in determining the right of preference is that of qualifications and the investigation is to enable the appointing officer or board to pass upon the comparative qualifications of the several candidates. McBride v. City of Independence, 134 Iowa 501, 110 N. W. 157.

In the case of Ross v. City Council of Sioux City, et al., 136 Iowa 125, 113 N. W. 474, 475, which was also an action by mandamus to compel the city council to employ the plaintiff as physician and health officer under the soldiers' preference law, again this court said:

"It is therefore apparent that it is only when the discharged soldier has equal qualifications with any other person who is being considered with reference to the filling of an office that the discharged soldier is to be given a preference. * * * Plainly, the *appointing board* must determine the question of moral character and competency, and must further exercise discretion in ascertaining whether the applicant under the soldiers' preference law has equal qualifications.

"Now, it is elementary that the action of mandamus will not lie to control the exercise of discretion on the part of a board upon which the duty to investigate and determine is cast. A board may be compelled to act, but its discretion cannot be controlled in such a proceeding. The statute gives to the complaining party *a remedy by mandamus to right the wrong* involved in

a *refusal to allow the preference* provided for; but this can mean no more than that the board shall be required to determine whether the applicant is entitled to the appointment which is sought."

The case of Arnold v. Wapello County, 154 Iowa 111, 134 N. W. 546, is another action of mandamus, involving the appointment of a janitor of the courthouse in the city of Ottumwa. The plaintiff, an old soldier, applied to the board of supervisors to fill the vacancy of janitor of the courthouse. On the same day the board by a majority vote appointed one, William Brady, who was not an ex-soldier. Thereupon the action of mandamus was brought and a hearing had thereon before the court. At such hearing the trial court found that Brady had been illegally appointed, in that the board had made no investigation nor given any consideration to the qualifications of the appellant before the appointment of Brady. A peremptory writ was granted directing the board to conduct an investigation into the relative merits of the plaintiff and said Brady and determine the fitness of such applicants for said position of janitor. The order of the court provided that the return to the writ should be made in ten days and continued the case for such purpose. Hearing was had before the board of supervisors and the testimony taken down in writing, and again the board determined that Brady had the better qualifications and again appointed him and made the return accordingly to the court with the written evidence of the witnesses examined before the board. Exceptions were filed to the return and a motion to quash the same, asking a peremptory writ installing appellant as janitor. All of which was refused by the trial court. This court again said:

"The only question presented by such motion, and the only question now presented for our consideration, is whether the testimony heard by the board of supervisors was such as to justify its appointment of Brady *in the exercise of its legal discretion.* The trial court thought it was sufficient and refused to interfere. We have read the evidence and reach the same conclusion. * * * It devolved upon the plaintiff to show that his qualifications were equal to those of Brady. *Upon a fair conflict of the evidence, it is not for us to say that the appointing board should have reached a different conclusion.*

"It is said that there was *an abuse of discretion;* but this

cannot be if the appointment *was sustained by substantial evidence.* \* \* \* It is undoubtedly true that a friendly board could have appointed Arnold as an old soldier, even though he did not possess equal qualifications with Brady. It is undoubtedly true, also, that a friendly board could have found the qualifications of Arnold equal to those of Brady upon the evidence in the record before us. But those are matters quite beyond the reach of a writ of mandamus. The duty of appointment involves the exercise of judgment and discretion *which the court cannot forbid.* The question of the relative merits of the contestants *is not triable de novo* before the trial court, nor before us. We can only interfere when the record discloses *bad faith* and *abuse of discretion* in a *legal sense.* Such a case is not presented in this record.'' (Italics ours.)

This matter was again before this court in the case of Miller v. Hanna, 221 Iowa 56, 64, 265 N. W. 127, 130, which involved the appointment by the board of supervisors of Wapello county of a superintendent of the county poor farm. The cases were reviewed and after a very thorough consideration by the court we said:

''The statute [referring to Code 1931] requires the board to make an 'investigation of applicant's qualifications *before appointing or employing* anyone to fill the *position,*' but it makes no provision as to the nature of the investigation to be made, and neither prescribes nor limits the same.

''It is therefore apparent that the nature of the investigation to be made is left entirely to the determination of the board. Its action upon the kind of an investigation to be made cannot be controlled by the courts. The legislature has left this matter open, and a public or private investigation, if one is actually made by the board of supervisors, would meet the requirements of the statute.'' [The law has since been amended, requiring a record finding specifying reasons for refusing the appointment. Acts 46th G. A., Ch. 7, Sec. 1] \* \* \*

''As the testimony shows that an investigation of some kind was made by the board, and as the testimony of appellees shows that they believed from the investigation made by them that the person appointed had greater qualifications than appellant, it is beyond our power to disturb the findings of the board. *The court cannot exercise the board's discretion for them,* nor can

we say that from the record in this case there was such an abuse of discretion as to warrant an interference of their action by the court.'' (Italics ours.)

The phrase in the last quotation, ''it is beyond our power to disturb the findings of the board,'' must, of course, be read with what follows and be held to mean that it is beyond our power to disturb the findings of the appointing power unless there is a clear, arbitrary abuse of discretion.

It will be noticed that in each and every one of the foregoing cases the action of mandamus was under the same identical law which is the basis of this action. We find no case in our reports where the action was by mandamus holding to the contrary. We have taken the trouble to investigate the decisions of some of our sister states having laws in substance identical with our own. The case of State ex rel. Meehan v. Empie, 164 Minn. 14, 204 N. W. 572, 574, involved the position of market master, an appointment by the mayor of the city of Virginia, Minnesota. The language of their statute, insofar as making investigation and as to maintaining an action of mandamus is concerned, is identical with ours, and in discussing this phase of the matter the Minnesota court said:

''It is the duty of the appointing body to make the investigation prescribed by the statute. That duty is imposed upon it directly. *Presumably it will discharge it fairly. The question of qualification or fitness is first and primarily for the appointing body.* The trial court on mandamus, *or this court on review, cannot substitute its own view of the fact. Only when the appointing power declines to investigate, declines to apply the law, or proceeds with manifest arbitrariness,* or something equivalent thereto, can relief be had by mandamus. *The court does not determine the question of fitness.* Evidence of it may be competent in determining whether the appointing body applied the law at all, or, applying it, proceeded with *manifest arbitrariness.* It is to be assumed that the appointing body will proceed with the investigation, and will be fair. If it chooses otherwise, there is difficulty of enforcement, arising from the inherent nature of the subject. *It cannot be remedied by the court through an assumption of authority to appoint.* Its power is confined within the limits which we have stated.

''The evidence was taken upon the theory, largely, at least,

that the issue was whether the relator was qualified for the appointment. The *real question* was *whether the council applied the law at all*, making the *required investigation*, or with *manifest arbitrariness* determined that the relator was not fit. The finding of the trial court is that the relator is possessed of the requisite fitness. That does not determine that he is entitled to the employment. *The trial court, or this court, may think him fit, and yet concede that a contrary belief of the council is sustained, or at least not so arbitrary as to vitiate its finding."* (Italics ours.)

This same rule was adhered to in a recent Minnesota case, State ex rel. Moilan v. Brandt, 178 Minn. 277, 226 N. W. 841, where the same principle was applied, and the court, in speaking of the investigation, said:

"Substantially every member of the council knew Moilan [the ex-soldier]. Some of them were boys with him. Some of them had investigated an application made by him two years before. Substantially all testified that they did not consider him fit for the position. We have considered the evidence with care. We do not find it necessary nor profitable to review it. The common council is the constitutionally created appointing power. The Soldiers' Preference Act does not intend otherwise. It does not mean to make the jury or a court a body which may review the act of the council. *It is only when there is a failure on the part of the council to act or a manifestly arbitrary action on its part that a court may interfere."* (Italics ours.)

The last statement of the Minnesota court is found in the case of State ex rel. Thornton v. Ritchel, 192 Minn. 63, 255 N. W. 627, 630, and this case is cited and relied upon very strongly by appellee, as receding from the views expressed in the former cases, yet it must be noticed that in the last paragraph the court takes the precaution to say:

*"We recognize the rule that the courts cannot by mandamus control the exercise of discretion* vested in an official or commission of this kind, but courts have the power to determine whether, on a given state of facts and under the law and rules applicable thereto, a commission or official had any discretion."* (Italics ours.) Just what is meant by the last part of this quotation is not very clear.

The state of Kansas has a law similar to ours, providing for the issuance of a writ of quo warranto to determine title to office, providing that the appointing power shall make an investigation, the same as our Soldiers' Preference Law. In the case of Dever v. Humphrey, 68 Kan. 759, 75 Pac. 1037, 1039, 1 Ann. Cas. 293, the court said:

"The duty of investigating and determining as to the qualifications of applicants for public position is placed on the appointing power—in this case upon the mayor. He did make inquiry, and did decide that the plaintiff did not possess equal qualifications for the office with defendant. That decision, which appears to have been honestly made, is not open to review or revision by the courts. The Legislature has placed the authority of making appointments mainly in the administrative officers and boards, and vested them with a discretion and judgment to determine who is best qualified to serve the public, and the general rule in such cases is that the courts cannot supervise the exercise of such authority, nor control the discretion and judgment so vested. * * * The character and extent of the investigation is not prescribed by the statute. The appointing power is expected to investigate in good faith, to fairly consider the qualifications, and to honestly determine the question submitted for decision. We discover nothing in the evidence or findings which impeaches the good faith of the mayor or would justify the court in treating the decision or the following appointment as nullities."

Such was the unanimous decision of the Kansas Supreme Court. The same rule is laid down in the United States Supreme Court, Keim v. United States, 177 U. S. 290, 20 S. Ct. 574, 44 L. Ed. 774.

Applying these legal principles to the record before us, we are unable to agree with the result reached by the trial court. If this case were to be determined by the court on the weight or preponderance of the evidence, we might not be disposed to disturb the finding of the trial court, but neither this court nor the trial court can substitute its discretion for the discretion of the appointing power. Had that been the intention of the legislature, it could have clearly said so. This result might be more nearly reached under the law as it now stands, by appeal, under section 1162-g1 which was enacted by the 46th General Assembly (chapter 7, section 2) as an additional remedy (which became

effective May 24, 1935), and which provides among other things that "*the court* shall receive and consider any pertinent evidence, whether oral or documentary, concerning said appointment from which the appeal is taken, and if *the court* shall find that the said applicant is qualified as defined in section 1159, to hold the position for which he has applied, said court shall, by its mandate, specifically direct the said appointing officer, board or persons as to their further action in the matter." (Italics ours.) The enactment of this additional measure would indicate that as construed by the lawmakers themselves, the right of complete review on the merits was not provided by the act under the mandamus section.

It would unduly extend this opinion to attempt to recite all the testimony. Briefly summarized, it shows in substance that both men were of good moral character and competent to perform the duties of chief of police. Both had lived in Iowa City for a sufficient length of time and had been sufficiently connected with public affairs in Iowa City and with the police department and city administration to know the duties necessary to be performed by a chief of police. Plaintiff had served in the same capacity for two years previous. Mr. Paine had been a member of the city council for eight years, a member of the school board, a member of the police and fire commission. Bender's qualifications were superior in regard to his ability to handle firearms and in special training and instruction along the lines of investigation of crime, such as finger printing, etc., to those of Mr. Paine. Practically all the testimony on behalf of the plaintiff related to the scope of his past experience—as chief of police, as to his expert ability in the use of firearms and in making finger prints, in his disposition to cooperate with the various departments of the state university and other civic bodies—and to his standing and good character in the community. Many high class, representative citizens and officials connected with the university speak of him very highly in respect to all these matters. Significant is the absence from the testimony of all these splendid witnesses of any direct inquiry with reference to Mr. Bender's attitude toward local law enforcement with reference to vice and crime, such as gambling, slot machines, punch boards, intemperance and kindred matters, which affect the morals of the local community. The officers of the university who would be most nearly in touch with this phase of the social life of the

student body of several thousand students attending the university, namely, the Dean of Men and the Dean of Women, were not called as witnesses, and not a single inquiry was made of any witness for the appellee in respect to this vital and essential qualification.

It appears quite plainly from testimony on behalf of the defendants that it was as to this phase of the matter of Mr. Bender's qualifications for this office, namely, his attitude toward law enforcement in the community, which was considered as the efficient and moving cause of turning the scales against him. He had just finished two years as chief of police. He had been appointed by the former mayor to this office on the special recommendation of Mayor Martin who had been closely associated with him in the National Guard, and during the same two years Martin was city solicitor and was intimately acquainted with his ex-service buddy, Mr. Bender, and therefore knew without calling in a multitude of witnesses the way and manner Bender as chief of police for the past two years had looked after law enforcement and matters affecting the morals of the community. Martin testified that in addition to his own personal knowledge he had received complaints against Bender in this regard. He was asked to state the source of those complaints and he said: "I would rather not state the source of those complaints about Mr. Bender." Appellee did not insist and the court did not command the witness to reveal the names. In addition to Martin, at least two members of the council and Mr. Paine testified to the fact of their own personal knowledge as to the prevalence of open public places where gambling was carried on, slot machines and other gambling devices were in operation during the two years that Bender was chief of police. Bender took the witness stand in rebuttal and again this matter of law enforcement, with the exception of one item relating to a house of ill fame, was not touched upon, and there is no denial by any witness of the conditions with reference to wide open gambling which prevailed during those two years, and we must take the record as a verity. One member of the council expressed the feeling of the council in these words: "We all felt law enforcement was a mighty important matter in this town."

There is also evidence that Bender was very lax in the matter of keeping records in his office and in cooperating with his former superior, who was ex officio police judge. Counsel for

appellee in cross-examination and in his argument, seeks to minimize the weight of the testimony of defendants' witnesses with reference to Bender's laxity in reference to these matters of local vice, by calling attention to the fact that Martin as city solicitor and these other witnesses who were members of the city council at the time, filed no complaints or information in reference to such infractions of the law. This affords no legal justification for misfeasance or nonfeasance of an officer charged with a special duty of enforcement of the criminal law and ordinances. Private citizens should not be required to embroil themselves personally. Most certainly they should support the officer by their public opinion and by giving testimony when called upon to do so. But it is a fact well known to the legal profession that as to such matters touching the personal conduct of individual citizens in the community, most people are very reluctant to tell what they know. But an officer should not be permitted to hide behind their failure to become personally officious in such matters.

The chief of police is a peace officer, holding an office specially created for the very purpose of placing the responsibility and duty upon him. He is required to take an oath and file a bond and is paid a salary. He is granted powers and clothed with authority, both by the legislature and the city council. It might well be asked, what right has a former peace officer to insist, even under the preference law, upon an appointment to an office which clothes him with the power, duty and responsibility of enforcing the criminal statutes and ordinances against vice and crime, when the evidence shows, and which is not seriously disputed, that during his previous term he apparently closed his eyes to wide-open violations of law, of which other citizens had knowledge, and knowledge of which must be imputed to a police officer whose public duty it is to make an investigation and see to the enforcement of the law. Should the court condemn the appointing power, namely, the mayor, for attempting to select a chief of police in whom he had faith and confidence and whom he considered would enforce these laws? Can the court say that the mayor acted arbitrarily because he did not call in outsiders to establish a fact of which he already had full and complete knowledge? To do so would be to place the weight of the highest organization in the department of justice in this state on the side of laxity in law enforcement.

The chief obstacle in the way of law enforcement is not lack of ability and efficiency in experience and training, especially as applied to local matters of this kind and character. There must be a willingness and a desire, which must spring from the inward parts of the individual and be a part of the very make-up of the man, to honestly and for the public good enforce the law and to keep the community free from open violation of the statutes and ordinances against vice and crime. Lacking this essential qualification, all others availeth nothing. The thought without the wish and will to enforce it is like a gun loaded with shot with no powder back of it. The apparent growing tendency on the part of society to satiate its inordinate desires and appetites in flouting openly laws enacted for the protection of society and the American youth should not have the sanction of the department of justice in any branch thereof, whether administered by the lowly constable or village marshal, or chief of police, or by the highest tribunal in this state. To rob the appointing power, the officer, board or commission, of a reasonable discretion in selecting peace officers in local communities, and to condemn the failure to call witnesses, who in the most part, common sense and experience would teach us, would be reluctant to reveal knowledge of facts of which the mayor already knew by his personal knowledge, his private investigation, personal acquaintance and prior close official relationship with the persons seeking to be appointed, is to make a farce of the law and to place an unnecessary and ridiculous burden upon the appointing power never contemplated by the legislature. The court is only concerned with the question of determining whether there has been a good faith, proper, sufficient investigation to acquaint the appointing power with the facts as to the qualifications of the applicants, and the court having found that such investigation was so made, unless it is plainly apparent that such official, in passing on the fitness of the applicants, acted arbitrarily and capriciously and contrary to the facts as plainly revealed by the testimony, it should not interfere. We are abidingly satisfied that the evidence is such that the minds of reasonable men might differ as to the respective qualifications of the two applicants; and that the mayor made sufficient investigation to acquire knowledge of the essential facts touching the qualifications of the applicants, and nothing appears in the record to impugn his honesty of purpose

or fairness in conducting the investigation to determine the fitness of the applicants:

We therefore hold that the law has been complied with and that there is no such showing of arbitrariness in the exercise of the discretion lodged in the appointing power to warrant the court in interfering. The conclusion we have reached on this phase of the case makes it unnecessary for us to determine other matters presented by appellants in their brief and argument. It necessarily follows that the judgment and decree of the trial court must be and is hereby reversed and remanded with instructions to enter a decree in harmony with this opinion.— Reversed and remanded.

PARSONS, C. J., and KINTZINGER, RICHARDS, and ALBERT, JJ., concur.

STIGER, MITCHELL, and DONEGAN, JJ., dissent.

STIGER, J. (dissenting)—I am unable to agree with the majority opinion, and therefore respectfully dissent.

The opinion of the majority is based on the erroneous assumption that the remedies of mandamus and certiorari provided for in chapter 60, 1931 code (section 1159 et seq.), known as the Soldiers' Preference Law, are no broader in their scope than the general statutory actions of mandamus and certiorari. In my opinion the remedy of mandamus given an ex-soldier by code section 1162 for a refusal to allow the preference and the remedy of certiorari given by section 1163 for the wrongful removal of an ex-soldier from office are much broader in their scope than the general actions of mandamus and certiorari, and authorize the reviewing tribunal to weigh the evidence and determine whether or not, under the testimony, the refusal to grant the preference or the discharge was justified.

The majority opinion follows the case of Miller v. Hanna, 221 Iowa 56, 65, 265 N. W. 127, 131. The Miller case was an action in mandamus to compel the defendants to appoint the plaintiff, an honorably discharged world war veteran, as superintendent of the Wapello County poor farm. The petition was dismissed and this court in affirming the action of the district court made the following pronouncement:

"As it was within the discretion of the board to determine

the qualifications of the applicants for the position applied for, and as they, in the exercise of such discretion determined that the applicant appointed had greater qualifications for the position than appellant, it is beyond our power to interfere with such discretion."

It is thus apparent that the case of Miller v. Hanna, supra, holds that the remedy of mandamus given by section 1162 of the Soldiers' Preference Law is, in its scope, the action of mandamus provided for in section 12440 under the general chapter on mandamus which action can compel the inferior board or person to act but cannot control its discretion, and that all the appointing officer has to show to sustain his refusal to appoint an ex-soldier is that he acted, that is, made an investigation, and that in his opinion the ex-soldier does not have qualifications for the position equal to the qualifications of the person appointed. This construction makes the appointing officer or board the final judge of the fact question as to whether or not the ex-soldier has equal or greater qualifications than the other applicants, subject to the qualification that the appointing officer must not be guilty of a legal abuse of discretion. The Miller case relies on the case of Ross v. City Council of Sioux City, 136 Iowa 125, 113 N. W. 474, which was an action by mandamus under the Soldiers' Preference Law to compel the defendant to employ the plaintiff as City Physician. The court states on page 127 that, "It is elementary that the action of mandamus will not lie to control the exercise of discretion on the part of a board upon which the duty to investigate and determine is cast. A board may be compelled to act but its discretion cannot be controlled in such a proceeding."

As above stated, this is an erroneous construction of the remedy and the action of mandamus *to right the wrong* (Italics mine) provided for in the Soldiers' Preference Law is a broader remedy than the general action of mandamus. Under the rule followed in the majority opinion, if an honorably discharged soldier asked for a writ of certiorari to review the action of his employer in removing him from a public position, the only question for the reviewing court to decide would be whether or not the board or officer exceeded his proper jurisdiction or otherwise acted illegally. Such construction nullifies the statute and we have held directly against this contention in the case of Butin v. Civil Service Commission, 179 Iowa 1048, 162 N. W. 565.

Section 1162-g1 provides in the Soldiers' Preference Law that in addition to the remedy of mandamus an appeal may be taken and further provides that on the trial *the court shall receive and consider any pertinent evidence, whether oral or documentary, concerning the appointment from which the appeal is taken, and if the court shall find that the applicant is qualified to hold the position,* the court shall direct the appointing officer to appoint the ex-soldier to the position. (Italics mine.)

All the remedies provided for in the Soldiers' Preference Law contemplate a trial and judgment on the merits.

In the case of Butin v. Civil Service Commission, supra, the plaintiff was under the Soldiers' Preference Law. The commission discharged the plaintiff, a policeman, and he removed the matter to the district court by writ of certiorari under section 1163. There was a trial in the district court on the evidence and the plaintiff was ordered reinstated. The appellants contended that because the commission had jurisdiction and did not act illegally, the reviewing tribunal may not, on certiorari, determine whether the action of the lower tribunal, on review, was sustained by the preponderance of the evidence. The court states, 179 Iowa 1048, on page 1049, 162 N. W. 565, 566:

"They plant themselves upon the single proposition that the district court had no power to pass upon the weight of that evidence. * * * If these general statutes control, the trial court lacked appellate power to weigh the testimony adduced before the commission, with a view of determining whether it justified discharge. If, on the other hand, said special provision in the Soldiers' Preference Law, construed with the general statutes on certiorari, so enlarge the review of such a discharge as to permit the testimony thus to be weighed, then the district court was right."

After stating that the purpose was to enlarge the scope of the review on certiorari to the extent of determining whether the discharge was justified on the merits, the court states on page 1051 [162 N. W. p. 567]:

"We think it must have been the purpose to enlarge the scope of the review to the extent of determining whether the discharge was justified on the merits. * * * We are of the opinion that the right to review by certiorari given in the Soldiers' Pref-

erence Act was intended to permit the reviewing court to consider anything which legitimately bore on whether the discharge was for any reason wrongful; that the legislature had power to enlarge the scope of review on certiorari; and that by the special provision aforesaid, it authorized the reviewing tribunal to pass upon whether the evidence justified the discharge. This construction alone gives force to all the statutes on the subject, and to the manifest legislative intent to make effective the prohibition against wrongful removals of honorably discharged soldiers."

It cannot be said that the legislature intended to enlarge the scope of the action of certiorari provided for by Code section 1163, and did not intend to enlarge the scope of the general action of mandamus in providing the action of mandamus to right the wrong in section 1162.

The construction of the remedies given to ex-soldiers in the Soldiers' Preference Law by the case of Butin v. Civil Service Commission, supra, is sound and gives full force and effect to the Soldiers' Preference Law. Prior to the case of Miller v. Hanna, supra, the Butin case was the latest construction of these remedies by this court. The Miller case does not refer. to the Butin case but rests its decision on the case of Ross v. City Council of Sioux City. We should follow the Butin case, and the case of Miller v. Hanna and the cases on which the opinion relies should be overruled.

The question to be determined in this case is, Did the evidence justify the district court in finding that the action of Mayor Martin in appointing C. O. Paine as chief of police in place of plaintiff, Bender, was arbitrary and an abuse of discretion; that such appointment was not based solely upon the qualifications of the applicants and that appellee Bender was entitled to the appointment on the merits?

The trial court correctly assumed that the hearing was on the merits. I extend the following testimony into the record to show that beyond question, the qualifications of Mr. Bender for the position of chief of police of Iowa City were equal to or greater than the qualifications of Mr. Paine.

Appellee Bender offered the evidence of Glen L. Schmidt, Acting Chief of the Bureau of Investigation of the State of Iowa; S. T. Morrison who is engaged in insurance and bond business in Iowa City; W. H. Bates, secretary of the State University of

Iowa; W. S. Buckley, sergeant instructor in the military department of the University of Iowa; A. A. Smith, supervisor of the buildings and grounds at the University; Mable R. Evans, probation officer of Johnson county; C. A. Bowman, postmaster at Iowa City; D. W. Crum, secretary of the Iowa City Chamber of Commerce; Mrs. Martin Pederson, executive secretary of Johnson County Chapter of American Red Cross; John McQuiston, connected with the police department of Iowa City 38 years and under the civil service 16 years; B. F. Carter, attorney and justice of the peace; Don McComas, sheriff Johnson County 4 years and present sheriff; M. E. Taylor, employee of the Iowa State Bank & Trust Company and member of the Junior Chamber of Commerce; O. M. Solem, director of athletics, University of Iowa; Frank J. Mezik, superintendent of mail at the postoffice at Iowa City; Roy H. Tapper, chief of police, Cedar Rapids, Iowa, and president of the Iowa State Chiefs' Association; C. C. Warden, manager Hotel Jefferson, Iowa City; L. H. Cann, personnel officer at University of Iowa.

The defendants offered the evidence of Thomas E. Martin, mayor of Iowa City; Jacob Van Der Zee, W. F. Boiler, T. F. Foote, Earl Kurtz, George Bouck, H. F. Willenbrock, J. A. Swisher, all councilmen of the city of Iowa City and defendants herein; C. O. Paine, present chief of police and defendant; and George Dohrer and E. B. Raymond, city clerk and treasurer, respectively, of Iowa City. No disinterested witness testified for the defendants. Only four witnesses testified to the qualifications of Mr. Paine.

There was no evidence offered by the defendants other than their own testimony with the exception of the testimony of the city clerk and treasurer.

Prior to Mr. Paine's appointment he was a member of the city council for eight years, a member of the Iowa City Independent School Board for three years, and was on the police and fire commission from April 1, 1933, to April 1, 1935. He has been treasurer of the Carpenter's Union since 1918. He states that he knew what the duties of chief of police were at the time of his appointment from observation and from information acquired as a member of the police and fire commission. He is fifty-seven years old.

Mr. Bender, an over-seas veteran, is 43 years old, was a deputy sheriff of Johnson County from 1923 to 1926, a member

of the Iowa National Guard for a period of 6 years and received an honorable discharge therefrom with the rank of sergeant. He is an expert in the use of firearms. While chief of police from 1933 to 1935, he was not off duty on account of ill health. He was a subscriber to periodicals on police work and studied the duties and requirements of a chief of police. He attended a school of instruction for chiefs of police. While in the National Guard he took training in the taking of finger prints and has had experience in that line. As sergeant in the National Guard he worked under his captain, Thomas E. Martin, in handling the traffic problems occasioned by athletic events at the University.

The defendant Foote testified that at the various meetings with the mayor at which appointments were discussed there was discussion and recommendation as far as the various groups that supported the new administration were concerned; that there might have been discussion about what these men would think of these appointments but the city council did not act on them; that he did not recall that there was any discussion as to the fact that Mr. Paine was loyal to the members that were elected; that he knew that Mr. Paine was quite a good worker for the group that elected the mayor and city council. He then stated: "That was not why Mr. Paine was appointed; it would be natural for the purpose of support." He further testified that he was not acquainted with Bender but did know Mr. Paine and was very much of the opinion that Mr. Paine was qualified to hold the office of chief of police; that his character is good as far as he knew.

Mr. Bouck, defendant, states in part, *that he would not be able to really say that Mr. Paine was the more qualified;* (Italics mine), that from his observation of the work of Mr. Paine he was doing very good; that basing his opinion upon the personal qualifications of the men irrespective of their performance as chief of police, he would prefer Mr. Paine.

Mr. C. O. Paine, defendant, testified in part, as follows: During the two years prior to April 1, 1935, he observed slot machines or punch boards used by the public or available for the public use in Iowa City; that he heard of one hotel which was a house of prostitution in Iowa City; that there were days when the slot machines could be found and other days when they could not be found; that they would be taken out of use for a period of

two or three days and then put back again; that he did not think there were *as many* gambling devices running as there were before he became chief of police. On cross-examination the witness testified that he did not file any information against the people conducting these offenses. Paine was on the police commission at this time.

Mr. Willenbrock, defendant, testified in part, that from his observation and acquaintance with Paine and Bender, that in his opinion, Mr. Paine was better qualified for the office of chief of police. He gives no reason for his conclusion.

Mr. Swisher did not testify as to the qualifications of Bender and Paine.

The defendant Van Der Zee, now serving his third term as councilman, testified in part, that he observed and saw in operation slot machines and punch boards during the two years Bender was chief of police; that such gambling had been going on for six or seven years; that he did not file information with the chief of police when he knew gambling was going on, or notify the mayor because he was interested in how long the thing would go on before the gambling would be stopped. He stated that six years ago, and before Bender was appointed chief of police, he did investigate the slot machine offense and reported to the council.

Mr. Martin, who was city attorney when Bender was chief of police, testified in part, that he consulted with a great many personal acquaintances about town about the qualifications of the applicants for the position of chief of police and that he considered his own personal acquaintance with applicants and the information obtained in arriving at his decision. Mr. Martin does not state the source of his information or what the information was. He further testified that from his investigation and from his acquaintance with the office of chief of police and from consideration of the merits and qualifications of the applicants, that Paine was the better for the office of chief of police; that he discussed the qualifications of the applicants for chief of police with the city council and considered such information in arriving at his decision; that he was anxious that his appointments meet with the approval of the city council and that they be satisfied with them; that at the time Mr. Bender was appointed chief of police, he thought he was qualified for the position but that he did not live up to his expectations and did not

perform his duties in the manner he thought that he would when he suggested him to Mayor Breene for appointment; that he received during his investigation, complaints of Mr. Bender. The witness did not state from whom he received the complaints nor what the complaints were. Such negative testimony is entitled to little weight. The witness further states that he did not investigate the ability of Paine with firearms; knew he had no experience as a police officer; that he did not know whether or not he was a veteran of any war, and did not know whether or not he could take finger prints. The mayor's investigation of Mr. Paine's qualifications was limited. In answer to the question, "Don't you know several members of the council indicated that certain groups of people had elected you and you should favor those and consider their wishes?", his answer was, "I was very happy to consider the wishes of all my personal acquaintances at all times." Mr. Martin further testified that he was familiar with gambling conditions during the years of 1933 and 1935, while he was city attorney; that he discussed the matter with Mr. Breene and Mr. Bender; that he did not file any charges because he did not think that it was his duty, as city attorney, to file any charges. With regard to the immorality at the hotel, Mr. Martin testified, "I had reason to believe the matter of the New West Hotel was discussed and that the city attorney (Mr. Martin) in connection with the county attorney was investigating that matter and that it was under investigation by the chief of police (Bender) of Iowa City: I know that the chief of police was interested in the matter. I was present at the conference when Mr. Breene asked Mr. Bender to handle the situation. At that same meeting, Mr. Bender asked me for a legal opinion."

Mr. Van Der Zee testified that his personal objection to Bender was not based on malfeasance but on misfeasance and nonfeasance.

The only complaints against Mr. Bender seem to be the slot machine situation, the house of ill fame, and his failure to turn in certain fees. With regard to the slot machine situation, appellee Bender states that there were slot machines in public places in operation during the time he was chief of police; that he put out of operation perhaps a dozen during his term and filed charges in two instances; that there were punch boards in public places and there was a city ordinance prohibiting them, and they were removed from the counters; that there were no

slot machines in operation and exposed to the public previous to his going out of office but were a few punch boards.

With reference to the house of ill fame, Mr. Bender testifies that prior to the expiration of his term he had obtained information and testimony as a basis for a proceeding in regard to clearing up the situation and so informed the county attorney, and that he and the county attorney were making an investigation and were well along in their efforts when his term expired.

With reference to the alleged failure of turning in fees belonging to the city, the defendant Martin testified that when he was considering appointments it came to his attention that no returns had been made to the city for fees collected on towed-in automobiles and from disposition of stray animals and that he took this into consideration in making his appointment. Martin stated on cross-examination that he had no personal knowledge of whether or not there were any fees for any services rendered for which fees could be collected during the two years; that he did not consider Mr. Bender dishonest in the matter of such fees.

An ordinance provided that for any vehicle serviced or towed, a fee of $2.00 must be paid for its release. About this matter Bender testified that in most cases the cars were towed in by garages who were paid for the services; in a few instances the cars were towed by the individual cars of the police and in such cases the fees were paid to the policeman using his car; that when the police car was used the funds collected were put into a box and used for office purposes. That he followed the same practice observed by his predecessor in the office and whether that practice was legal or illegal he followed it.

Plaintiff's witness McComas, present sheriff of Johnson county and former member of the Iowa City police department, testified that it was the custom while he was on the police department to put the fees obtained from towing by the police car into a kitty and used for stuff bought for police department.

Bender testified that the money was used for the purpose of ammunition, long distance phone calls and other small matters for which their was no appropriation. Bender further testified that he did not know there was an ordinance requiring a charge of $2.00 for towing automobiles until February 1935.

Mr. Dohrer testified that this ordinance was not contained in the published volume of ordinances.

With respect to the fees to be collected from the disposition of stray animals, Bender testified:

"I have only knowledge of one horse and one dog that were taken from off the street of Iowa City during my term of office and we immediately notified the owners and there was no charge for holding or any care of such animals. We do not have any pound in connection with the police station."

The defendants offered no testimony that Bender was not of good character. Several witnesses for the plaintiff testified to the good character of Bender. The record shows without contradiction that Bender is a man of good character.

Mr. Bates, supervisor at the State University, testified in part, "Mr. Bender cooperated with the University; was very courteous and a little more so than the past administrations of the department; he seemed to be willing to give more time to it and more consideration. This is in regard to policing, parking, small thefts and things generally."

Mr. Cann, personnel officer of the State University, testified that: "As Assistant Juvenile Officer I had occasion to come in contact with the police department and chief of police. I observed the way he handled the police department and the juvenile cases. I had about four contacts a week with Mr. Bender. It is my impression that the relationship of the two offices was the best that I have had any contact with of any man that was acting as chief of police. Mr. Bender rendered the fullest cooperation in our juvenile cases."

Mr. Solem testified that: "I have not had any complaints regarding conditions which are not most conducive to good scholarship and athletics."

Mr. Mezik, superintendent of mail of the post office testified: "In my work with the commission they wanted reprints of finger prints and I knew of nobody better qualified so I asked the chief of police, Mr. Bender to assist me, which he did. I had a case of a crippled hand with the hand rather hard to get finger prints of owing to the club nature of the hand so I sent these in and they were not accepted; Mr. Bender helped me and the commission accepted them. I know Bender to be of good character."

Mable R. Evans, probation officer of Johnson County, for fifteen years, testified in part, that she had known Mr. Bender about eight years; that during his two years as chief of police

she worked with him in his official capacity; that she had the cooperation and courtesy of the department; that she observed his ability as a deputy sheriff and chief of police in juvenile work and he worked very well with her office.

It would serve no good purpose to further extend the testimony into this record.

The witnesses for appellants do not describe the qualifications of Mr. Paine that entitle him to the office over Mr. Bender. They merely state their conclusion that Mr. Paine is better qualified than Mr. Bender. No disinterested witness testified for appellants.

They testify vaguely of complaints made against Mr. Bender but do not state what the complaints were or whether they were serious or trivial. Mr. Martin does not disclose the persons he questioned about the qualifications of the applicants for the position of marshal, nor the information received. He does state that he talked with the members of the city council whom he was anxious to satisfy and testified that: "It was understood that my appointments would be satisfactory to the council members prior to the meeting on Monday night, April 1st, 1935."

Mr. Foote did not know Mr. Bender.

Mr. Paine was a good worker for the group that elected the mayor and city council.

If Mr. Bender had closed his eyes to evil conditions in Iowa City, or had failed to do his full duty, the citizens of Iowa City would have been ready and willing to so testify and supplement the testimony of the official family.

Mayor Breene was ill and in the hospital during most of the time Bender was chief of police, and thus additional responsibilities were placed on Mr. Bender during the two years he was chief of police.

I find no substantial evidence of nonfeasance or misfeasance, or malfeasance in office by Bender. I find nothing in the record that justifies the statement in the majority opinion, in referring to Mr. Bender, "that during his previous term he apparently closed his eyes to wide open violations of law of which other citizens had knowledge." The majority opinion admits that, "If this case were to be determined by the court on the weight or preponderance of the evidence, we might not be disposed to disturb the finding of the trial court, but neither this court nor the

trial court can substitute its discretion for the discretion of the appointing power.''

I have carefully read the record, and I conclude that the evidence establishes by a clear, substantial preponderance of the evidence that Mr. Bender had equal or greater qualifications for the office of chief of police than Mr. Paine; that he was of good moral character and able to perform the duties of the position, all of which is established by such weight of the preponderance of the evidence that the failure of Mayor Martin to appoint appellee Bender to the office of chief of police was not justified on the merits. Furthermore, under the rule followed in the majority opinion the refusal to appoint Bender was an abuse of discretion.

I would affirm.

MITCHELL and DONEGAN, JJ., concur in this dissenting opinion.